# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

COLLETTE TAYLOR, *et al.*,

        Plaintiffs,

    v.                                 Case No. 04-C-1203

WAUSAU UNDERWRITERS INSURANCE
COMPANY, *et al.*,

        Defendants.

---

## DECISION AND ORDER

---

On July 24, 2001, James Taylor, formerly a correctional officer, was charged with attempted murder, kidnaping, and sexual assault of a minor, and was incarcerated at the Fond du Lac County Jail. Although he was placed on suicide watch in a cell with constant camera surveillance, Taylor managed to commit suicide during the evening of August 19, 2001. His estate, wife and son now bring the present lawsuit under 42 U.S.C. § 1983, alleging that County Correction Officer Darwin Schmidt was deliberately indifferent to the risk that he would harm himself, in violation of the Fourteenth Amendment.[1] The plaintiffs also allege that Fond du Lac County maintained an unconstitutional informal policy of allowing inmates on suicide watch to turn out their lights, a key factor in Taylor's ability to evade detection and commit suicide. In addition to their claims under

---

[1]Plaintiffs also named County Correction Officers Janell Mueller (now Krief), Jerome Gau, and Mary Steberg as defendants, but now concede that the evidence may not be sufficient to support claims against any of them and have stipulated to their dismissal. (Pls.' Br. In Opp. at 1.) Based upon plaintiffs' stipulation, all claims against defendants Mueller, Gau, and Steberg will be dismissed with prejudice.

federal law, the plaintiffs have asserted a wrongful death claim under state law alleging that the defendants were negligent in failing to prevent Taylor's suicide.

The case is presently before me on the defendants' motion for summary judgment. The parties have fully briefed that motion and have appeared for oral argument. For the reasons set forth below, I conclude the motion should be granted and plaintiffs' federal claims dismissed with prejudice. With respect to the state law claim, I will follow the recommended practice of declining jurisdiction so the significant issues of state law it raises can be addressed in state court.

## I. BACKGROUND

Upon being booked at the jail on July 24, 2001, Taylor was given an initial mental health assessment. Although he did not present any mental health symptoms, jail staff decided to place Taylor on suicide watch in light of the heinous nature of the charges against him, as well as the fact that he was a former corrections officer. As noted, the cell in which he was placed had a camera in it which allowed correctional officers to observe him. In addition to being placed in an observation cell, Taylor was made to wear a so-called suicide smock, a tear-resistant garment held together with velcro. He was also issued a tear-proof blanket.

Between booking on July 24 and August 8, Taylor generally appeared normal to all concerned. On August 8, however, Taylor managed to smuggle a small plastic razor back to his cell. Jail staff normally kept fastidious records of who had been issued razors and whether the razors had been returned, but apparently on that day they were not sufficiently diligent. In any event, within an hour the staff became aware of the missing razor, and a search of Taylor's room produced the razor as well as an elastic band from Taylor's underwear. The incident resulted in the punishment of three staff members.

2

That same day, as a result of the razor incident, as well as the fact that Taylor had some superficial scars on his wrist, Taylor was seen by a psychiatric social worker named Michael Schafer. Taylor attributed his wrist lacerations to scratching an itch too aggressively; he also repeatedly denied having any self-destructive tendencies. Schafer concluded that Taylor did not warrant further mental health treatment and was not depressed, although he was experiencing adjustment disorder. He also concluded that Taylor should remain on suicide watch.

A week later, Taylor expressed a desire to shave and be able to wear standard jail clothing (rather than the smock) in view of an upcoming family visit. On August 16, Schafer again met with Taylor and concluded that Taylor's requests were reasonable and that Taylor did not present a risk of harming himself. The request for standard prison clothing was approved, although Taylor would not be allowed to wear undergarments given his tearing out of the elastic on previous garments. Taylor would also be allowed to use a razor and a pen or pencil under supervision.

On August 19, correctional officer Darwin Schmidt began his shift at 3:00 p.m. working primarily in the control room. Among his duties was the monitoring of Taylor, both in person and on camera. He personally observed Taylor reading a book in his cell at 8:11 p.m. Twenty minutes later, Schmidt observed (through the camera) Taylor pacing in his cell. Roughly ten minutes later, Schmidt noticed that Taylor had turned off the light in his cell. Although it was against jail procedures to allow inmates on suicide watch to turn off their lights, this did not particularly bother Schmidt because Taylor had turned off his light before without incident.

At roughly the same time (8:40 p.m.), corrections officer Kathryn Kuitert left the control room to begin dispensing medication to the inmates. Schmidt told her before she left that Taylor's light would need to be turned back on. Kuitert explained what happened next:

Case 1:04-cv-01203-WCG   Filed 03/28/06   Page 3 of 31   Document 52

> Then I [Kuitert] walk away with the med cart and noticed his lights were off, and I said -- I think I said, Taylor, you know you can't have your lights off. And then I got closer and I said, Do you want your Tylenol? Because I believe he was taking Tylenol for his ankle, I believe. And his lights were off and I flipped them on.

(Supp. Skemp Aff., Ex. 2 at 32.)

When she turned on the light Kuitert observed Taylor in a "praying" position at the rear of his cell. Upon further examination, however, it was clear that Taylor had hanged himself with some article of clothing or other mechanism (strangely, it remains a mystery as far as the record is concerned). Kuitert radioed for help and an ambulance soon arrived, but it was too late. Taylor died. Claiming that his death was caused by the deliberate indifference, or at least the negligence, of the defendants, plaintiffs commenced this action.

## II. ANALYSIS

I begin my analysis with a discussion of the law as it relates to the federal claim plaintiffs have asserted. I will then proceed to apply that law to the specific facts of the case and finally turn to plaintiffs' state law wrongful death claim.

### A. Inmate Suicide and Deliberate Indifference

Plaintiffs' federal claim is predicated on the principle adopted by the Supreme Court in *Estelle v. Gamble*, 429 U.S. 97 (1976), that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Id.* at 104. Although the Eighth Amendment is not applicable in this case since Taylor was a pretrial detainee at the time of his death, as opposed to a prisoner serving a sentence, the same principle applies through the Due Process Clause of the Fourteenth Amendment. *Frake*

4

*v. City of Chicago*, 210 F.3d 779, 781-82 (7th Cir. 2000). In any event, the principle derives from the fact that "[a]n inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Estelle*, 429 U.S. at 103. The same fact underlies the more general common law duty of jail and prison officials to provide appropriate medical care for prisoners that is reflected in the American Law Institute's Restatement of the Law of Torts. *See* Restatement (Second) of Torts § 314A(4) (1965).[2] At common law, a jailer's negligence in providing such care gives rise to liability to the prisoner for any resulting loss. *Brownelli v. McCaughtry*, 514 N.W.2d 48, 50 (Wis. 1994). To establish a violation of constitutional rights for § 1983 purposes, however, negligence is not enough. A prisoner must prove that the prison or jail official acted with "deliberate indifference toward serious medical needs." *Estelle*, 429 U.S. at 104. But whether one looks to the Constitution or common law, the duty of the jail or prison official to act arises out of the fact that a prisoner is unable to take the ordinary steps needed to protect himself from risk of harm.

The harm addressed in *Estelle* was the additional pain, suffering, and even death that can result from untreated illnesses and injuries. The doctrine has also been applied, however, to encompass not just the physical health needs of inmates, but also their mental health needs. For instance, *Partridge v. Two Unknown Police Officers,* 791 F.2d 1182 (5th Cir.1986), was one of the

---

[2]Restatement (Second) of Torts § 314A describes the duty that a common carrier owes to its passengers. With respect to the duty of a jailer or prison guard, subsection (4) states: " One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other."

5

early decisions to recognize the applicability of *Estelle*'s analysis to detainee suicide cases. The court clearly framed the issue in terms of mental health, finding a

> duty, at a minimum, not to be deliberately indifferent to Partridge's serious medical needs. A serious medical need may exist for psychological or psychiatric treatment, just as it may exist for physical ills. A psychological or psychiatric condition can be as serious as any physical pathology or injury, especially when it results in suicidal tendencies. And just as a failure to act to save a detainee from suffering from gangrene might violate the duty to provide reasonable medical care absent an intervening legitimate government objective, failure to take any steps to save a suicidal detainee from injuring himself may also constitute a due process violation.

*Id.* at 1187.

The principle has also been applied outside the medical context to require prison guards and jailers to take reasonable steps to protect inmates from physical assaults by known violent inmates. *E.g., Farmer v. Brennan*, 511 U.S. 825, 833 (1994) ("Having incarcerated persons with demonstrated proclivities for antisocial criminal, and often violent, conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course.") (internal quotation marks and brackets omitted). But in each of the situations described above it is the fact that the prisoner, by virtue of his incarceration, is deprived of his normal opportunities for protecting himself that gives rise to the duty of the prison or jail officials to act.

The rationale underlying such claims would seem to require a threat to the inmate's safety from which, as a result of his incarceration, he is unable to protect himself. It was for this reason that I asked the attorneys for the parties to address the question whether, absent evidence of mental illness or some other condition that deprived an inmate of his rational faculties, a jail custodian could be held liable for an inmate's suicide. The question seemed relevant in this case because it

6

appeared there was no evidence that Taylor suffered from a mental illness or was under the influence of some sort of intoxicant such that he was deprived of his rational faculties and unable to control his own conduct.[3] The evidence suggests just the opposite – that faced with the shame and embarrassment of being charged with a series of despicable crimes, and the possibility of spending most of the rest of his life in prison, Taylor deliberately chose to take his own life.[4]

Of course, there is the theory that "no suicide is truly intentional, because it can never be the act of a free will." *Joseph v. Alaska*, 26 P.3d 459, 471 (Alaska 2001). This may even be the dominant view of modern psychiatry. According to one commentator,

> The psychiatric community's attitude toward the causes of suicide has changed greatly since scholars first probed into the motivation for the behavior. Today, the psychiatric community no longer views the decedent as a wrongdoer. Rather, it views him as having a serious mental illness. Under modern thought, all persons who commit suicide do so because they cannot appreciate the nature of their act. Scholars believe that all suicidal decedents act under pressure of unconscious forces. Therefore, a person who commits suicide because of such an illness cannot be responsible for his act.

Allen C. Schlinsog, Jr., *The Suicidal Decedent: Culpable Wrongdoer, or Wrongfully Deceased*, 24 J. Marshall L. Rev. 463, 477-79 (1991). But this is not the understanding of human behavior upon

---

[3]Although there is a hint of depression or "adjustment disorder" here, those are not the linchpins of the plaintiffs' case. In truth, such conditions are borne by the jail population on the whole. Instead, plaintiffs believe Taylor's risk of suicide was essentially based on a rational, rather than deluded, sense of reality. That is, he was suicidal not because of mental health problems, but because "upon admission [he was] a prominent member of the community and the alleged offense [was] likely to cause him great embarrassment." (Pls.' Supp. PFOF ¶ 5.) Thus, "[w]hen Taylor was admitted to the jail, he fell into a high risk for suicide category given that Taylor was accused of a heinous crime that had much notoriety." (*Id.* ¶ 6.) In other words, given the nature of the crime, who he was, and the potential for a life in prison accompanied by profound embarrassment, the risk of suicide was poignant because it proved a tempting, even understandable, choice, *not* because he suffered from a mental illness that robbed him of his rational faculties.

[4]We don't know how strong the possibility of conviction was. By taking his own life, Taylor deprived the State of its opportunity to prove its case against him.

which our law is based.[5]  The law assumes that, absent serious mental illness or other form of

incapacity, a person has free will and is therefore responsible for his own intentional acts.  *See*

*Morissette v. United States,* 342 U.S. 246, 250-251 (1952) (noting that mature legal systems

envision "belief in freedom of the human will and a consequent ability and duty of the normal

individual to choose between good and evil.")

If in fact Taylor was not suffering from a mental illness, then it appeared there was no threat

to his physical safety from which he could not protect himself and toward which jail officials acted

with deliberate indifference.  The threat to Taylor's physical safety was not from a serious medical

or psychological condition for which the jail failed to provide essential treatment; nor was it from

another violent inmate.  The only threat to Taylor's physical safety was from himself, and that threat

would have remained whether he was incarcerated or not.  There was nothing jail officials could do

to take away Taylor's shame and embarrassment or the possibility of lengthy imprisonment.  And

there is no evidence that they were deliberately indifferent to any risk to his safety that, by virtue

of his incarceration, he was unable to address himself.

Under these circumstances, the viability of a deliberate indifference claim could be

considered doubtful.  How can one claim that jail guards, acting under color of state law, subjected

Taylor to cruel and unusual punishment, or deprived him of life without due process of law, when

he intentionally took his own life?  One could reasonably argue, it seems, that denying liability for

_____

[5]This view is also inconsistent with views of those who have strongly advocated for a constitutional right to assisted suicide.  *See  Washington v. Glucksberg,* 521 U.S. 702, 735 (1997) ("Americans are engaged in an earnest and profound debate about the morality, legality, and practicality of physician-assisted suicide."); *see also Gonzales v. Oregon*, ___ U.S. ___, 126 S. Ct. 904, 163 L. Ed. 2d 748 (2006) (holding that federal Controlled Substance Act does not authorize Attorney General to prohibit doctors from prescribing regulated drugs"for use in physician-assisted suicide); *Freeman v. Berge*, No. 05-2820, slip op. at 5 (7th Cir. March 23, 2006) (noting "there *are* rational suicides") .

8

inmate suicide in the absence of evidence of mental illness or other incapacity is more consistent with the rationale underlying the deliberate indifference doctrine, and the language and history of the Eighth Amendment.[6]   To hold otherwise would also seem to be permitting a prisoner "to engineer an Eighth Amendment violation," something the Seventh Circuit has explicitly cautioned against.  *Rodriguez v. Briley,* 403 F.3d 952, 953 (7th Cir. 2005).[7]

In response to my query, however, neither attorney, not even counsel for the defendants, thought that the absence of any mental impairment was fatal to plaintiffs' claim, and it now seems clear to me that their view of the current state of the law is correct.  Although the issue of whether the deliberate indifference rationale applies when an inmate's suicide is not the result of mental illness or other incapacity has not been explicitly addressed by the courts, implicit in virtually all of the cases involving inmate suicides is the assumption that the absence of mental illness is not fatal to such a claim.  *See, e.g., Boncher ex rel. Boncher v. Brown County*, 272 F.3d 484, 486 (7th Cir. 2001); *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 531-32 (7th Cir.2000).

Indeed, it is not difficult to see why.  The idea that jail guards could intentionally stand by, or even cheer, while an inmate who is under the stress of being accused of a crime and experiencing the pain of separation from family and friends, as well as the fear, isolation and hopelessness that are commonplace in prison, attempts to take his own life is shocking to any civilized person.  No one seriously argues that jail and prison officials should not be required to use reasonable efforts

---

[6]Imposing liability on prison or jail officials for a sane inmate's suicide also seems inconsistent with the common law concept of legal cause which is discussed below in relation to plaintiffs' state law claim.  "[T]he Supreme Court has made it crystal clear that principles of causation borrowed from tort law are relevant to civil rights actions brought under section 1983." *Buenrostro v. Collazo,* 973 F.2d 39, 45 (1st Cir.1992) (citing *Malley v. Briggs*, 475 U.S. 335, 344 n. 7 (1986) and *Monroe v. Pape*, 365 U.S. 167, 187 (1961)).

[7]Indeed, that is what Taylor appeared to do here.  Plaintiffs concede the evidence suggests that Taylor had been testing the officers' response for awhile.  (Pls.' Supp. PFOF ¶ 19.)

9

to prevent all inmates, whether sane or insane, from taking their own lives. A basic respect for the value of human life would seem to demand as much. *See also Freeman*, slip op. at 6 (noting there may also be practical reasons for preventing inmate suicide).

Of course, it is one thing to say that the state should take reasonable steps to prevent inmate suicide; it is another to hold that failing to do so amounts to the infliction of cruel and unusual punishment even when the suicide is the product of a deliberate choice of the inmate. And while imposing liability on prisons and jails that fail to take steps to prevent inmate suicide, regardless of the sanity of the inmate, is one way of deterring indifference to the risk of inmate suicide, it is not the only way. Suicide prevention policies, such as the County's in this case, along with direct punishment of guards who fail to comply with such policies, such as also occurred in this case, are also ways to insure that guards do not treat inmate suicide threats with indifference, even when they are not due to mental illness. True, the very existence of such policies may, at least in part, be due to the threat of civil liability. But it is by no means clear that, even if liability were limited to cases involving mentally ill or intoxicated inmates, jail and prison officials would abandon their suicide prevention policies.

Notwithstanding the foregoing considerations, however, I am satisfied that the present state of the law is clear – deliberate indifference to a substantial risk of suicide by an inmate, even a completely sane and rational inmate, constitutes a violation of the inmate's constitutional rights. *See Freeman*, slip op. at 5-6. It therefore follows that the fact that Taylor was not mentally ill is irrelevant to his claim against the jail and its officers, except to the extent that the absence of mental illness would have made his suicide less foreseeable. It is enough for plaintiffs to show that prison officials were cognizant of the significant likelihood that Taylor intended to take his own life and

10

that they failed to take reasonable steps to prevent him from succeeding. *Turbin*, 226 F.3d at 529. With that understanding, I will proceed to the specific due process claims plaintiffs assert here.

The plaintiffs' case is based on a two-fold theory of deliberate indifference. First, plaintiffs claim the County was deliberately indifferent to the safety of inmates like Taylor because it had an informal policy of allowing inmates on suicide watch to turn off their own lights. Second, plaintiffs claim officer Darwin Schmidt was deliberately indifferent to Taylor's safety when he failed to immediately respond when Taylor turned off his light. I will address each in turn, beginning with plaintiffs' claim against the County based on the allegedly deficient policy of the Sheriff.

**B. Plaintiffs' Claims Of Deliberate Indifference**

**1. The Jail and Sheriff Pucker**

   **a. Policy and Practice**

The plaintiffs argue that although the County and the Sheriff, Gary Pucker, "had a policy of not allowing inmates on suicide watch to shut off their lights, they condoned the breach of that policy [by] placing inmates on suicide watch in cells where they were able to easily turn off the lights." (Pls.' Br. at 5.) In other words, allowing suicide watch inmates like Taylor to control their lighting establishes that Pucker and the County were indifferent to Taylor's safety. The plaintiffs have retained an expert, Thomas Rosazza, who believes that the jail should have disabled the light switches and that the failure to do so establishes indifference. This is because it is impossible to adequately supervise an inmate if visibility is compromised. The defendants respond that there is no case law that requires lights to be always turned on in suicide watch cells, and thus the jail's allowing of access to light switches cannot be the basis for any constitutional violation.[8]

---

[8]To the contrary, a recent decision by the Seventh Circuit suggests that constant illumination, *i.e.*, leaving lights on, can constitute cruel and unusual punishment since it exacerbates mental illness. *See Scarver v. Litscher*, 434 F.3d 972, 974-76 (7th Cir. 2006).

Although municipalities and supervisors are not liable under a theory of *respondeat superior*, they may become liable when a policy or wide-spread practice is instrumental in the constitutional violation, *Calhoun v. Ramsey,* 408 F.3d 375, 379 (7th Cir. 2005), the theory being that a practice that is wide-spread must at least be ratified by the higher-ups. As noted, the wide-spread practice alleged to be unconstitutional here is the jail's allowing inmates access to their light switches; indeed, the plaintiffs argue that it was essentially deliberate indifference *per se* to allow such access. It is certainly undisputed that allowing suicide watch inmates access to their light switches was a wide-spread practice, given that the physical makeup of the jail cells allowed inmates to reach the switches. But it is not that practice that caused, or allowed, Taylor's death.

First, it is not as though the jail "allowed" inmates to turn off their lights in the sense that the jail condoned such behavior. The light switches were located on the outside of the cells, and to access the light switch an inmate had to reach through a flap in the door of his cell. Officers would then respond by turning the lights back on within a number of minutes (in Taylor's case, it was about ten.) Thus, the real "practice" at issue here involved not just the fact that inmates could physically reach their switches, but the response of prison staff to that situation. If guards responded within seconds, for instance, the inmates' ability to turn out their lights would be useless. If a wide-spread practice is at issue here, it is the practice of not responding immediately whenever an inmate's light is turned out.

But the plaintiffs put forth little evidence about whether the officers' reaction in this case was a standard practice or an aberration. We know that Schmidt either told Kuitert that Taylor's light needed to be turned back on, or at least he knew that she would personally visit his cell on her rounds within several minutes. But we do not know whether this roughly ten-minute gap was

12

standard operating procedure or whether the Sheriff condoned such a policy. Indeed, the plaintiffs tell us nothing about whether what happened here was the result of any systematic practice so widespread that it rose to the level of being unofficial policy. *Bradich*, 413 F.3d 688, 690 (7th Cir. 2005). That is fatal: to create municipal liability, the practice must be "so permanent and well-settled as to constitute a 'custom or usage' with the force of law," and of that there is simply no evidence. *Calhoun,* 408 F.3d at 379. Because we do not know these important details, I cannot conclude that any policy of the jail or the County was a cause of Taylor's death, and thus I cannot find liability on the part of the Sheriff or the County itself. *See Turbin*, 226 F.3d at 532 ("The plaintiffs have not presented any evidence that WCJ personnel regularly ignored established WCJ policies, rather than simply failing to follow certain policies in the singular instance of their treatment of Novack.")

### b. Deliberate Indifference

Even if I could conclude that the jail's unofficial policy of allowing inmates access to their light switches was responsible for Taylor's death here, there is still no inkling of deliberate indifference. To be liable, a defendant must know of a substantial risk of suicide and then intentionally disregard that risk. *Matos ex rel. Matos v. O'Sullivan,* 335 F.3d 553, 557 (7th Cir. 2003).

First, plaintiffs' suggestion that it is apparent Taylor was a substantial suicide risk based solely on the fact that the jail officers classified him as a suicide risk and took precautions to prevent him from killing himself must be rejected. The primary reason Taylor was placed on suicide watch was based not on anything particularized to Taylor–e.g., his behavior, mental illness, etc.–but on the policies and precautions taken by the jail. Plaintiffs seem to argue that because the jail

13

*perceived* Taylor as a risk, Taylor *was* a risk. The plaintiffs note repeatedly how staff placed him on suicide watch, in a particular camera-monitored cell, and with fifteen-minute in-person visual checks. Each of these precautions shows, plaintiffs believe, "an extremely higher sensitivity to the fact Taylor could commit suicide." (Pls.' Supp. PFOF ¶ 10.) That much is true: all the safety measures the jail took demonstrate a "higher sensitivity" to the risk. But that says nothing about whether the risk was itself manifest. For example, a city's mayor could place the city on red alert for a terrorism threat, but the actual risk might be either overstated or nonexistent; the fact that the city was sensitive to a risk does not mean the risk was real. The city could have been acting on bad or stale information, or it simply could have been overreacting to weak information. Regardless, it is clear that the higher sensitivity to the risk, on its own, says nothing about the underlying *veracity* of that risk.

The point is worth emphasizing because much of the plaintiffs' evidence of a substantial suicide risk is so dependent on the jail's perception of risk rather than on factors establishing its objective reality. For example, the plaintiffs argue that because the jail placed Taylor in Cell #3, which is intended for "inmates having mental or emotional difficulties severe enough to constitute a danger to themselves," it must follow that Taylor *was* a grave suicide risk. The most unusual factual finding proposed by the plaintiffs is as follows:

> Not only was Taylor on a suicide watch throughout his incarceration, but Taylor was on one of the highest levels of suicide watch and that every possible restriction was placed on Taylor, other than a suicide smock and getting another person's opinion, and there was no more possible restrictions that could be placed on Taylor at the time of his suicide.

(Pls.' Supp. PFOF ¶ 8.) Although one would think this finding was written by the *defendants* in order to demonstrate the thoroughness and diligence with which they tried to prevent Taylor's

14

suicide, the plaintiffs instead believe the fact that the jail took substantial safety measures demonstrates that the risk was real.

In fact, the evidence suggests otherwise. A central problem with the plaintiffs' perception-equals-reality approach is that it leaves no room for caution, no possibility that the jail was simply playing it safe in taking all the precautions it did. And that is apparently what happened here. As Mark Strand, the jail administrator, himself put it,

> Well, I guess I didn't – I never considered him to be a high risk. It's standard for us if it's a first-time arrest, if it's the severity of the offense and the likelihood that they stay in custody, that's a – that's a standard thing for us to do. No different than if a person goes to court on a trial, found guilty with the potential of going to prison, we will keep a closer eye on them when they return from their verdict.

(Supp. Skemp Aff., Ex. 3 at 28.) When pressed later in his deposition, Strand again reiterated that "I don't want to say he was a – likely a threat to himself because I'm not sure why he wanted that razor. But again, we would always err on the side of safety." (*Id.* at 31.) We need not take Strand at his word to accept that it is at least a possibility that the mere institution of a safety measure does not necessarily mean that the threat was real.

Apart from the problem that the perceived risk does not necessarily speak to the reality of that risk, the plaintiffs' argument creates an obvious, and troubling, catch-22 situation for the jail. If the jail takes the many precautions it did here, the plaintiffs count that as a strike against the jail because the precautions show that the risk of suicide was grave and real. But to the extent the jail did *not* take certain steps (such as preventing inmates from turning their lights off), that is *also* a strike against it, offered by the plaintiffs as evidence that the jail was deliberately indifferent to the risk of suicide. The safety measures taken (or not taken) by the jail cannot cut both ways. Indeed, to be consistent under the plaintiffs' main theory, the fact that inmates had access to their light switches could actually be used as evidence that the risk of suicide was not, in the end, all that great.

15

Independent of the *perceived* risk, the plaintiffs cite the fact that Taylor was a former corrections officer whose heinous crimes made him a risk of suicide. That, after all, was the basis for the jail's placing him on suicide watch in the first place. But these generic factors cannot mean one has a *substantial* risk of suicide; indeed, that would require the building of massive suicide watch wings at nearly every jail and prison. As is often noted, jail inmates are often depressed, angry, frightened, etc., and are "not a random sample of American citizens." *Jutzi-Johnson v. United States,* 263 F.3d 753, 757 (7th Cir. 2001). Thus, it is not enough to say that the mere fact of Taylor's incarceration and the nature of his crimes made him suicidal, because that would mean most people in jail or prison were suicidal.

In addition to the jail's classification of Taylor, his pre-arrest status, and the heinous nature of the charges he was facing, however, there was also the incident of the stolen razor, the scratches to his wrists and the elastic band from his underwear. Is this evidence from which a reasonable jury could conclude that Taylor posed a substantial risk of suicide? Prison inmates do use razor blades for purposes other than harming themselves. *See, e.g. Velez v. Johnson*, 395 F.3d 732 (7th Cir. 2005) (razor blade used to threaten another inmate). And a lone and superficial laceration does not create a *substantial* suicide risk. As the court noted in *Jutzi-Johnson,* where an inmate had committed suicide following excessive scratching and picking at himself, "[h]ad Johnson developed infections from his obsessive picking and scratching, the government might well be liable; for infection is a foreseeable result of that behavior. Suicide, so far as the record shows, is not." *Id.* at 757. Still, it is difficult to think why Taylor would remove the elastic band in his underwear if not to use it as a noose. Schafer, the social worker, noted that the superficial scratches might have resulted from a "superficial" suicidal gesture. (Schafer Dep. at 25:1, Supp. Skemp Aff., Ex. 3.)

16

Perhaps considered in its totality, this episode was enough show that Taylor presented a substantial risk of suicide.

But even if it was, there is no evidence that the County was indifferent to that risk. As the Seventh Circuit has noted, "[j]ail managers who decided to take no precautions against the possibility of inmate suicide – to have no policy, for example no suicide-watch option – would be guilty of deliberate indifference in the relevant sense." *Boncher*, 272 F.3d at 486. That is, the county may be liable if the jail management "ignor[ed] a known and serious risk of death of persons under their control for whose safety they are responsible." *Id.*

It is true that a jail having *no* suicide watch policy could be liable for deliberate indifference, but that fact has little bearing on the present case. Here, Taylor's suicide was not aided or abetted by any sort of institutional ignorance or indifference to the risk of suicide; instead, the suicide occurred *despite* the jail's numerous precautionary steps. Tellingly, the plaintiffs have not come forth with any cases in which deliberate indifference was established when, as here, the inmate *was* placed on suicide watch. The plaintiffs' argument is simply that the suicide watch at the Fond du Lac County Jail was inadequate because Taylor, a former corrections officer, found a way to elude it. But to be deliberately indifferent the County must have *ignored* a risk or have been indifferent to it; it is not enough to have reacted to the risk inadequately or imperfectly. Such a claim, if true, only shows mere negligence, and mere negligence is not enough to establish a violation of Taylor's constitutional rights. In sum, I find that plaintiffs have not established that any wide-spread policy of the jail was responsible for Taylor's death. Even if that could be established, there is no evidence that such policy demonstrates the deliberate indifference of either Pucker or the County.

17

**2. Darwin Schmidt**

The plaintiffs' other deliberate indifference claim is leveled at Officer Darwin Schmidt. The plaintiffs claim that, in failing to act immediately when Taylor turned off his light, Schmidt allowed Taylor ample opportunity to take his own life; the delay in responding, plaintiffs contend, constitutes deliberate indifference.

**a. Substantial Risk of Suicide**

To restate, the plaintiffs must show that Schmidt knew of a substantial risk of suicide and was indifferent to that risk. *Matos,* 335 F.3d at 557. This requires both that a substantial risk of suicide existed and also that Schmidt subjectively knew about the risk. "The subjective standard requires the court to find that the official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Sherrod v. Lingle,* 223 F.3d 605, 611 (7th Cir. 2000) (quoting *Farmer*, 511 U.S. at 837).

The plaintiffs have little evidence that, even assuming Taylor actually was a substantial risk of suicide, Schmidt knew about that risk. Most problematic is the fact that the entirety of the plaintiffs' efforts to establish what Schmidt knew are actually based on a cobbling together of information that was known to *others*. First, the plaintiffs claim the risk of suicide was known because Mark Strand, the jail administrator, placed Taylor on suicide watch, instituted fifteen-minute checks, disallowed Taylor to wear underwear and monitored his use of pens and pencils. Second, Officer Kuitert, who found Taylor dead in his cell, agreed with the proposition that there was a "heightened awareness" about Taylor given the restrictions placed on him, the smock, and the use of a suicide (tear-proof) blanket. Third, social worker Michael Schafer continued to

18

recommend that Taylor be kept on suicide watch. Finally, both experts retained for this litigation expressed their view that Taylor presented a risk of suicide, given the superficial cuts on his arms.

According to the plaintiffs, the amalgamation of this evidence means that Schmidt knew Taylor was a substantial risk of suicide: "[t]he testimony of Strand, Kuitert, Schafer, Feinsilver, and Rosazza [the two experts] all contribute and provide evidence that Darwin Schmidt was aware of a substantial risk of suicide." (Pls.' Br. at 16.) The knowledge possessed by others does not speak to what Schmidt himself knew, however. At the outset, it is obvious that the experts retained for purposes of this litigation (Feinsilver and Rosazza) would have no relevant opinion about what Schmidt knew on August 19, 2001. As to the knowledge of other jail officials, it is clear that the plaintiffs' evidence is based on the proposition that because Taylor was on suicide watch, Schmidt must have known he was a substantial risk. But the mere fact that Taylor was on suicide watch says nothing in itself about what Schmidt subjectively knew. As the Seventh Circuit has noted,

> [p]lacing [an inmate] on a high level of suicide watch does not automatically impose on those responsible for the precaution a constitutional obligation to devise a treatment plan premised on the probability that [the inmate is] on the verge of suicide. No one can predict suicide with any level of certainty; medical professionals at jails, based on limited information, must decide whether a person is little, some, or a serious risk of suicide. *Placing a pre-trial detainee on some level of suicide watch, even the highest level, does not demonstrate a subjective awareness of a substantial risk of imminent suicide.*

*Collignon v. Milwaukee County,* 163 F.3d 982, 990 (7th Cir. 1998) (emphasis added). Thus, the fact that a jail places someone on suicide watch is not conclusive proof that there actually was a substantial risk of suicide–that, after all, is a constitutional standard for deliberate indifference crafted by courts. Jails and prisons do not operate merely within the boundaries of what the Constitution and the courts *allow*; instead, they are entitled to use caution, develop best practices,

and, in general, "play it safe." As the previously quoted deposition testimony of jail administrator Mark Strand demonstrates, if there is even a *remote* possibility of suicide, the jail might exercise caution and place the inmate on suicide watch; in that event, the fact that a suicide actually ensues does not mean that the suicide was a substantial risk *ab initio,* nor does it speak to the subjective knowledge of any particular prison guard. Thus, the mere fact that Taylor was on suicide watch is only evidence that officials at the jail considered him a suicide risk. It says nothing about how grave jail staff perceived that risk to be, much less what Schmidt perceived it to be. Accordingly, it is not enough here for the plaintiffs to show that Schmidt knew that Taylor was on suicide watch and that other jail officials considered Taylor to have an unspecified risk of suicide.

This much was recognized by the Sixth Circuit in *Comstock v. McCrary,* 273 F.3d 693, 712 (6th Cir. 2001). In addition, the *Comstock* court emphasized that what's important is not just the substantial risk of suicide *in the abstract,* but the risk of suicide in the particular context facing the defendant at the time. In other words, even if Schmidt *did* know that Taylor posed a substantial risk of suicide, that is not enough; to be liable here Schmidt must have known that Taylor was *still* a substantial risk even though he was incarcerated in a suicide watch jail cell with all the corresponding precautions taken by the jail in place. In the words of the *Comstock* court:

> Plaintiff is unable, however, to allege facts from which we could conclude that Howell subjectively perceived "a substantial risk of serious harm" to Montgomery's health and safety. *Of course, Montgomery was presumptively suicidal because he was on suicide watch. Plaintiff, however, must do more than put forward facts that would show that Howell, the physician's assistant, perceived Montgomery to be suicidal. Even if he was aware that Montgomery was suicidal, Howell would not have perceived that Montgomery posed a substantial risk of harm to himself while on suicide watch.* During Howell's physical examination, Montgomery was in close observational status and dressed in a suicide prevention garment. Montgomery had been stripped of his personal clothing, limited to finger foods, and was checked on every ten minutes; all sharp objects had been removed from his surroundings. It is

20

> simply impossible for us to conclude that Howell perceived a substantial risk that Montgomery would commit suicide when he observed Montgomery in these circumstances. *Thus, plaintiff has failed to put forward facts that would demonstrate that Howell was aware of a substantial risk of serious harm to Montgomery, i.e., that Montgomery actually would, or could, inflict serious harm to himself while on suicide watch.*

*Id.* (emphasis added). That the risk must be assessed in context is obvious from the nature of the deliberate indifference analysis itself. Liability for deliberate indifference punishes not mere *knowledge* about a risk, of course, but the failure to act upon that knowledge. Necessarily, the failure to act can only be analyzed in terms of the situation at hand, not in the abstract. In other words, one cannot be deliberately indifferent to a risk unless one's actions, *in that context,* cause or allow the harm to ensue.

As in *Comstock,* the plaintiffs here have offered no evidence that Officer Schmidt was subjectively aware that Taylor was a risk to himself despite all the precautions taken by the jail to protect him. That is, even if we impute all the knowledge that *others* had about Taylor's suicidal ideation, it still does not show that Schmidt knew that Taylor posed a risk to himself now that he was placed on suicide watch. Put another way, there is no evidence that Schmidt believed the jail's precautions were inadequate. Instead, it is reasonable to conclude (absent evidence to the contrary) that Schmidt believed it was nearly impossible to commit suicide in a suicide watch cell given the ban on any sharp objects, the suicide blanket, and the like. The fact that the lights in the cell were to remain on–except for brief periods when the inmate would turn out the light and the guards would respond within minutes–was simply an additional guarantee not just against suicide, but against any other kind of self-harming behavior.

In sum, the plaintiffs fail on two fronts. First, the efforts to impute the knowledge of others to Schmidt are unsuccessful. Second, even if the evidence was sufficient to establish that Taylor

21

was a substantial suicide risk and even if Schmidt was aware of it, that risk existed only in the abstract sense that Taylor would likely have committed suicide if released on bond or left to his own devices in the general jail population. In the actual situation faced by Taylor, and by Schmidt, there is no evidence that Taylor *still* presented a substantial risk of suicide while incarcerated in a suicide watch cell, given the strict restrictions the jail imposed and given constant camera observation able to be thwarted only in brief increments. Accordingly, no jury could reasonably find that Schmidt was aware of a substantial risk that Taylor would kill himself in the suicide watch cell.

**b. Indifference to the Risk**

Even assuming that the plaintiffs could show that Schmidt knew of a substantial risk of suicide, the plaintiffs cannot show that he was indifferent to that risk. As the *Comstock* court noted, context counts. *Id.* at 712. Under the facts presented here, the plaintiffs must show not just that Schmidt knew Taylor was a suicide risk in general, but that Schmidt knew that the gap of a few minutes in which Taylor's cell was dark would likely allow for the suicide. In other words, the plaintiffs must link Schmidt's purported failure–the delay in responding to the turned-off lights–to the underlying danger of suicide. For example, suppose Schmidt knew of a substantial risk of suicide yet allowed Taylor to bring a razor into his cell unsupervised. Because it is obvious what a suicidal inmate could do with a razor blade in short order, we could easily conclude that Schmidt was indifferent to the risk of suicide when he allowed the blade in. But the dangers in this case were not so obvious. Recall first that Taylor had turned his lights off before without any harm resulting, a fact which undercuts the notion that it was inherently dangerous to acquiesce in an inmate's lights being off for a brief period of time. Further recall that when Schmidt noticed the lights were off, he knew Kuitert would be at Taylor's cell within minutes. In addition, the jail had already placed

22

Taylor in a suicide watch cell with all of the other protections attendant on that status–checks on sharp objects, suicide smocks and blankets, etc.

Thus, in proper context, the question is whether Schmidt could be said to be deliberately indifferent at the moment he decided it would be okay for Taylor's lights to remain off for several minutes. Unfortunately, the plaintiffs do not answer this question. The plaintiffs do not explain, for example, what means Taylor would have had to kill himself in a short period of time; thus, we do not know what risks Schmidt would have been ignoring at that moment. Schmidt just as easily could have concluded that given all the other restrictions placed on Taylor, the fact that his lights would be off for a few minutes was of no moment. In retrospect, we know that Taylor hanged himself with something, but we are not told how, or why, Schmidt should have foreseen that Taylor would be able to do that. In sum, even if Taylor were a substantial risk of suicide were he left in the general jail population, the plaintiffs do not show how, given all the other precautions the jail took, allowing a few minutes to elapse before investigating a dark cell could constitute indifference. At worst the reaction here was negligent, but even that is questionable. Therefore, because there is neither evidence that Schmidt knew of a substantial risk of suicide nor evidence that he was indifferent to that risk, summary judgment is appropriately granted in his favor on plaintiffs' due process claim.

**C. State Law Claim Of Negligence**

Plaintiffs also asserted a state wrongful death claim against the defendants which rests on the allegation that the County correctional officers were negligent in failing to prevent Taylor's suicide. Defendants argue that summary judgment should be granted on plaintiffs' wrongful death action on the ground that Wisconsin public policy bars claims for wrongful death when the death

23

is the result of suicide.[9]   In the alternative, defendants contend that the court should decline jurisdiction over plaintiffs' state law claim and dismiss it without prejudice.

Having determined that plaintiffs' federal claims should be dismissed on summary judgment, I am authorized under 28 U.S.C. § 1367(c)(3) to decline jurisdiction over the remaining state law claim.  In fact, district courts are generally encouraged to decline jurisdiction in such cases so as "to minimize the occasions for federal judges to opine on matters of state law."  *Van Harken v. City of Chicago*, 103 F.3d 1346, 1354 (7th Cir.1997).  If, on the other hand, "an interpretation of state law that knocks out the plaintiffs' state claim is obviously correct, the federal judge should put the plaintiff out of his misery then and there, rather than burdening the state courts with a frivolous case."  *Id.*; *see also  Boyce v. Fernandes*, 77 F.3d 946, 951 (7th Cir.1996) ("The normal practice of course is to relinquish jurisdiction over a supplemental claim when the main claim is dismissed before trial, but if the supplemental claim is easily shown to have no possible merit, dismissing it on the merits is a time saver for everybody.").  Thus, the question presented is whether defendants' argument that plaintiffs' state law claim is barred by Wisconsin public policy is obviously correct.

Defendants' argument that plaintiffs' state wrongful death claim is barred certainly has some merit.  A basic principle of causation in tort law is that a superseding cause of the plaintiff's loss relieves the defendant of liability.  *See* Restatement (Second) of Torts § 440.[10]   In the context of a

---

[9]Defendants also argued plaintiffs' state law claim is barred by Wisconsin's three-year statute of limitations.  *See* Wis. Stat. § 893.54(2).  It appears, however, that defendants have abandoned their statute of limitations defense in the face of plaintiffs' contention that the limitations period was extended by operation of the State's notice of claims statute.  *See* Wis. Stat. § 893.80(1)(b); *Colby v. Columbia County*, 550 N.W.2d 124 (Wis.1996).

[10]Restatement (Second) of Torts § 440 provides:

A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about.

wrongful death action where the death resulted from suicide, "the practically unanimous rule is that such act is a new and independent agency which does not come within and complete a line of causation from the wrongful act to the death and therefore does not render defendant liable for the suicide." C. T. Drechsler, Annotation, *Civil Liability for Death by Suicide*, 11 A.L.R.2d 751 § 4[a] (1950). Wisconsin also follows this rule. *See McMahon v. St. Croix Falls School Dist.*, 596 N.W.2d 875, 879 (Wis. App. 1999) (" Wisconsin follows the general rule that 'suicide constitutes an intervening force which breaks the line of causation from the wrongful act to the death and therefore the wrongful act does not render defendant civilly liable.'") (quoting *Bogust v. Iverson,* 102 N.W.2d 228, 232 (Wis. 1960)).

However, courts have recognized two exceptions to the rule that suicide constitutes a superseding cause in a wrongful death action. "The first is where defendant's negligent or criminal conduct can be said to have caused the deceased to commit suicide. The second is where a special relationship exists between the defendant and the deceased justifying the creation of a duty to prevent suicide or other physical harm." *Logarta v. Gustafson*, 998 F.Supp. 998, 1004 (E.D.Wis.1998). It is the second exception that is in play in this case. As noted above, the County corrections officers clearly had a duty to protect Taylor from threats to his safety by virtue of the fact that he was in their custody. But does this mean the superseding cause doctrine does not apply even when the suicide is not the product of mental illness or other incapacity?

Several courts have held that the doctrine does apply and, thus, the custodian is not liable when the inmate is not insane or otherwise incapacitated. *See City of Belen v. Harrell*, 603 P.2d 711, 714 (N.M. 1979) (holding that trial court erred in refusing to instruct the jury on the issue whether inmate's suicide constituted independent intervening cause or contributory negligence);

*Lucas v. City of Long Beach*, 131 Cal. Rptr. 470, 475 (Ct. App. 1976) ("The general rule is that a jailer is not liable to a prisoner in his keeping for injuries resulting from the prisoner's own intentional conduct."); *Pretty On Top v. City of Hardin*, 597 P.2d 58, 61 (Mont. 1979) (same). The majority rule, however, is clearly to the contrary. *See Joseph*, 26 P.3d at 474 (collecting cases). And on at least two occasions the Seventh Circuit has held that the superseding cause doctrine has no application when the custodian of a jail or prison is negligent in failing to prevent an inmate suicide that is foreseeable. In *Myers v. County of Lake, Ind.*, 30 F.3d 847, 852-53 (7th Cir. 1994), the court, applying Indiana law, affirmed a judgment in favor of a sixteen-year-old who was severely injured when he attempted to hang himself at a county juvenile detention facility. In so ruling, the court rejected the county's argument that the plaintiff's intentional act was the superseding cause of his own injury, stating "[i]f the custodian has a duty to protect the inmate from himself, the fact that the inmate tried to harm himself is a reason for liability rather than a defense." 30 F.3d at 852.[11]

---

[11]The *Myers* court cited comment d to Restatement (Second) of Torts § 314A as support for its conclusion that a custodian has a duty to protect an inmate from the inmate's own intentional acts. 30 F.3d at 853. Section 314A, as noted above, describes the duty of a common carrier to its passengers, and states that one who lawfully takes custody of another is under a similar duty to that person. The *Myers* Court quoted that portion of comment d that states "The duty to protect the other against unreasonable risk of harm extends to risks arising out of the actor's own conduct." *Id.* The term "actor", as used in the comment, however, refers to the carrier or custodian, not the injured plaintiff. A closer reading of the entire comment suggests that the duty to protect the plaintiff inmate from his own conduct extends only to his own negligent acts. The comment in its entirety reads:

> The duty to protect the other against unreasonable risk of harm extends to risks arising out of the actor's own conduct, or the condition of his land or chattels. It extends also to risks arising from forces of nature or animals, or *from the acts of third persons, whether they be innocent, negligent, intentional, or even criminal*. (See § 302B.) It extends also to risks arising from pure accident, *or from the negligence of the plaintiff himself*, as where a passenger is about to fall off a train, or has fallen. The duty to give aid to one who is ill or injured extends to cases where the illness or injury is due to natural causes, to pure accident, to the acts of third

26

Likewise, in *Jutzi-Johnson*, the court rejected the government's argument that liability for negligence in failing to prevent an inmate at a federal jail from hanging himself was barred by the doctrine of superseding cause on the ground that the doctrine "is not applicable when the duty of care claimed to have been violated is precisely a duty to protect against ordinarily unforeseeable conduct." *Id.* at 756. *Jutzi-Johnson* involved application of federal law to a claim under the Federal Torts Claim Act, 28 U.S.C. §§ 2671-80.

Of course, since neither *Myers* nor *Jutzi-Johnson* involved Wisconsin law, they are not determinative of the issue before me and do not constitute binding precedent in this case. And while they appear to reflect the majority view, I respectfully note that grounds may exist to question the Seventh Circuit's reasoning in both. To conclude from the fact that a party has a duty to protect another that any breach of that duty must be a legal cause of resulting harm to the other seems to conflate two separate and distinct concepts. For a jailer to be liable for failing to prevent harm to an inmate, the inmate must first establish that the jailer had a duty to prevent the harm claimed. As already noted, the custodial relationship gives rise to the duty of the prison or jail official to provide for the care and protection that an inmate, by reason of his incarceration, is unable to provide for himself. Absent that relationship, there is no legal duty to provide an individual with care at all, and even when such a relationship does exist, the duty to act only arises when the custodian is aware of the risk, *i.e.*, when the danger is foreseeable. The question of cause, however, is not about whether the custodian has such a duty. It assumes a duty exists since one doesn't even get to the question

---

persons, or to the negligence of the plaintiff himself, as where a passenger has injured himself by clumsily bumping his head against a door.

Restatement (Second) of Torts § 314A, comment d (emphasis added).

of cause unless the plaintiff first establishes a duty to act and a breach of that duty. In the present context, the question of cause concerns whether the custodian's breach of the duty to protect an inmate, assuming such breach can be proven, can reasonably be considered a legal cause of the inmate's death in the face of the intentional and deliberate character of the inmate's action.

In considering this question, it should be noted that it is not the fact that the harm alleged was the result of an intentional act that gives rise to the possibility that a competent inmate's suicide is a superseding cause. Again as already noted, an intentional act by a third person will not amount to a superseding cause and thereby relieve a custodian of liability where the action of the third person is foreseeable. *See* Restatement (Second) of Torts § 448.[12] For example, if Inmate A was injured as the result of an assault by Inmate B, the fact that Inmate B acted intentionally would not relieve a prison guard of liability to Inmate A if the guard knew or should have known of the risk to Inmate A from Inmate B and took no action to protect him. But under the facts of this case, the intentional act under consideration is not the act of a third person; it is the intentional act of the very person through whom plaintiffs' claim derives. It's as if Inmate B in the above example also sued the guard for deliberate indifference and sought to recover damages to compensate him for the punishment (i.e., loss of good time, time in segregation) that he received as a consequence of his assault on Inmate A on the theory that the guard's failure to prevent Inmate B from assaulting Inmate A caused Inmate B damage. Inmate B's lawsuit would make no sense, even if he could

---

[12]Restatement (Second) of Torts § 448 states:

The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime.

show that the guard knew of his plan to attack Inmate A ahead of time and did nothing to stop it. The deliberate character of Inmate B's own conduct would "supersede" any failure to act on the part of the guard as a cause of his Inmate B's injury or loss.

Based on the foregoing and notwithstanding the precedent cited above, it would appear that an argument can be made under traditional common law principles governing causation that the deliberate choice of a sane inmate to take his own life should constitute a superseding cause of loss to his estate and family that would relieve a negligent prison or jail guard of liability for such loss. As between a sane inmate who intentionally takes his own life and a prison guard who is negligent in failing to stop him, the legal cause of the inmate's death would be the intentional act of a free agent. The law presumes individuals act with free will, and there is nothing in particular about the custodial setting of a jail that changes that fact. As the Chief Justice of the Alaska Supreme Court has written:

> I do not believe that prisoners should be regarded in tort law as having lost the capacity to act intentionally concerning self-harm simply because they are incarcerated. To be sure, some prisoners, such as those who are recently jailed and intoxicated, present a strong case for the incapacity exception to the intentionality rule. But others do not. People in prison may choose suicide after cool deliberation for a wide variety of reasons that are in no sense unique to their incarceration. Long-term illness might be one example, an effort to collect insurance for one's family may be another.

*Joseph*, 26 P.3d at 479-80 (Matthews, C.J., dissenting).

Such a result would perhaps seem unfair to the family of an inmate who takes his own life. But in this connection, it should be remembered that the inmate's family and estate are standing in his shoes. This is a legal fiction, of course, but it is as if the inmate himself is seeking compensation for his own voluntary, sane act. Viewed from this perspective, it seems strange to order a prison

29

or jail guard to compensate a sane inmate who deliberately takes his own life for the loss of that life on the ground that the guard was negligent in failing to prevent the inmate from carrying out his intent. Nevertheless, that appears to be the majority rule.[13]

Wisconsin courts appear not to have addressed this issue directly, however, and since the defendants' argument that plaintiffs' wrongful death claim is barred by public policy appears to be the minority rule, I cannot say that it is "obviously correct." Thus, for me to rule on the issue raised by defendants would require me to decide a question of first impression involving Wisconsin's public policy. This is precisely the type of issue over which federal courts are directed to relinquish jurisdiction when the federal claims drop out of a case so as to avoid unnecessary pronouncements on state law. *See Myers*, 30 F.3d at 849-50. I therefore conclude that plaintiffs' state law claim for wrongful death should be dismissed without prejudice for lack of federal jurisdiction.

### III. CONCLUSION

In sum, based on the plaintiffs' stipulation, all claims against defendants Mueller, Gau and Steberg are dismissed with prejudice. For the reasons set forth above, I conclude that plaintiffs

---

[13]Such a rule would also lead to strange results in comparative negligence states such as Wisconsin. Under Wisconsin law, a defendant can interpose the contributory negligence of the plaintiff, or the person from whom the plaintiff's claim is derived, as a defense. If the jury finds the plaintiff contributorily negligent, the defendant is not liable at all if the plaintiff's negligence exceeds his own and, even if it does not, any recovery is reduced by the amount of the plaintiff's contributory negligence. *See* Wis. Stat. § 895.045(1). There is no theory in Wisconsin law, however, that would allow a comparison of a plaintiff's intentional conduct against the negligence of a defendant. Rejection of the doctrine of superseding cause in a state like Wisconsin would thus lead to the absurd result that in the case of an inmate who accidentally killed himself, a negligent guard would be able to interpose the inmate's own conduct as a defense, but if the inmate intentionally took his own life, the inmate's conduct would be irrelevant. *See, e.g., Myers*, 30 F.3d at 853.

30

cannot show deliberate indifference on the part of any of the remaining defendants to what they knew to be a substantial risk of suicide by Taylor.  Accordingly, the motion for summary judgment is granted and the clerk is directed to enter judgment in favor of the defendants dismissing plaintiffs' federal claims with prejudice.  With plaintiffs' federal claims gone, I relinquish jurisdiction over the remaining state law claim and order it dismissed without prejudice.

**SO ORDERED** this __28th__ day of March, 2006.


s/ William C. Griesbach
William C. Griesbach
United States District Judge

Case 1:04-cv-01203-WCG   Filed 03/28/06   Page 31 of 31   Document 52